UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT


**No. 10-2193**


_____

MARK FRAPPIER

Plaintiff/Appellant

v.

COUNTRYWIDE HOME LOANS, INC.

Defendant/Appellee
_____


**Appeal from the United States District Court
for the District of Massachusetts**


_____


***APPELLANT'S BRIEF***


_____


Appellant by his attorney,
/s/ Valeriano Diviacchi
Valeriano Diviacchi
First Circuit Bar #22408
Diviacchi Law Office
111 Beach Street     #1A
Boston MA 02111-2532
(617) 542-3175

# TABLE OF CONTENTS

Page

Table of Authorities ................................................................................. *i*

Jurisdictional Statement ........................................................................... 1

Statement of Issue Presented for Review .............................................. 1

Statement of the Case ............................................................................. 2

Statement of Facts .................................................................................. 2

Summary of the Argument....................................................................... 9

Standard of Review ................................................................................. 11

Argument ................................................................................................. 12

I.     THE DISTRICT COURT EXHIBITED A FACTUAL AND LEGAL
       MISUNDERSTANDING OF THE NATURE OF PREDATORY LENDING
       THAT NEEDS TO BE REVERSED AND CLARIFIED BY THIS COURT
       GIVEN THE PUBLIC POLICY AT ISSUE........................................... 12

       A. Massachusetts Law without doubt creates a standard of care and duty for
       the Defendant to avoid fraud and not to ignore fraud in its underwriting that
       was applicable to the Defendant at all material times of this Action. ....... 14

       B.     The reasonable inference from the facts is that fraudulent income was
       used or ignore by Defendant's employees to avoid the Plaintiff's >75% D/I.
       ............................................................................................................... 15

II.    BASED ON THE SUPREME JUDICIAL COURT'S ANALYSIS,
       DEFENDANT AS A MATTER OF LAW BREACHED A LEGAL DUTY
       ESTABLISHED BY STATUTE, REGULATION, AND THE COMMON
       LAW AND SUCH BREACH IS AS A MATTER OF LAW AN UNFAIR
       AND DECEPTIVE ACT THAT IT, NOT THE PLAINTIFF HAD, A DUTY
       TO PREVENT. ............................................................................... 26

       A.     Regardless of whether it occurred negligently or intentionally,
       Defendant is liable for ignoring a 70% discrepancy in its prepared, reviewed,
       and printed income records and a >70% D/I that served essentially to use up
       Plaintiff's entire equity to maximize Defendant's profits. ........................ 27

III.    UNJUST ENRICHMENT AND BREACH OF THE COVENANT OF
        GOOD FAITH AND FAIR DEALING DAMAGES EXIST. ................  31

Conclusion  ........................................................................  34

Certificate of Compliance & Service

....................................................................................  35

Addendum (Memorandum and Order)..................................................  36

# TABLE OF AUTHORITIES

<u>Page</u>

*12 C.F.R. Pt.226, Supp. 1; § 226.29(b)(2);*
    *226.34, & 226.35*                          17, 22, 25

*15 U.S.C. § 1633*                              17

*15 U.S.C. §1639* (HOEPA)                       22, 25

*209 CMR §§53.03, 53.05*                        16, 18

*940 CMR §§8.05, 8.06*                          15, 16, 18

*American Law Institute Restatement of Restitution § 1.*    31

*Anthony's Pier Four, Inc. v. HBC Assoc.,* 411 Mass. 451 (1991)    32

*Belini v. Washington Mutual Bank,* 412 F.3d 17 (2005)    17

*Brandt v. Wand Partners,* 242 F.3rd 6 (1st Cir. 2001)    31

*Commonwealth v. DeCotis*, 366 Mass. 234 (1974)    27

<u>Commonwealth v. Fremont Investment and Loan,</u>
452 Mass. 733 (2008)                            14, 15, 16, 24, 26,
                                                28, 29, 30

*Druker v. Roland Women's Jutras Assoc., Inc.,*
370 Mass. 383 (1976)                            33

*Fenton v. John Hancock Mutual Life Insurance Company*,
400 F.3d 83 (1st Cir. 2005)                     12

*GTE Wireless Incorporated v. Cellexis International Incorporated,*
341 F.3d 1 (1st Cir. 2003)                      12

<u>In re Laudani</u>, 401 B.R. 9, 34 & n. 19 (D.Mass. 2009)    24, 25

*Kattur v. Demoulas*, 433 Mass. 1 (2000)        27

*Kerlinsky v. Fidelity & Deposit Co.,*
609 F.Supp. 1112 (D.Mass.1987)
aff'd, 843 F.2d 1383 (1st Cir. 1988)            27

*King v. Driscoll*, 424 Mass. 1 (1996)          33

# TABLE OF AUTHORITIES

<u>Page</u>

*Levings v. Forbes & Wallace, Inc.,* 8 Mass.App.Ct. 498 (1979)          27

<u>Mass. Infirmary v. QLT Incorporated,</u> 412 F. 3d 215
1st Cir. 2005)          32

*M.G.L. c. 93A §§2, 9*          15, 27

*M.G.L.c. 140D §§10 ( c), 12(b)(2)*          17, 18

*M.G.L.c. 183, §28C*          13, 16

*M.G.L. c. 183C, § 2, 4*          16, 24

<u>McCabe v. Gedco LLC,</u> 345 BR 1 (D.Mass.2006)          31

<u>Miliken & Co., v. Duro Textiles, LLC,</u> 451 Mass. 547 (2008)          27

*Nat'l Shawmut Bank v. Fidelity Mut. Life Ins. Co.,*
318 Mass. 142 (1945)          31

<u>Nortek, Inc. v. Liberty Mut. Ins. Co.</u> 65 Mass.App.Ct. 764 (2006)          33

*PMP Assocs., Inc. v. Globe Newspaper Co.,*
366 Mass. 593 (1975)          27

*Warner Ins. Co. v. Comm'r of Ins.,* 406 Mass. 354 (1990)          32

## JURISDICTIONAL STATEMENT

A.      The District Court had jurisdiction of this matter pursuant to *28 U.S. Code §1332* because this case involves citizens of different states and the matter in controversy exceeds the sum of $75,000. Plaintiff is a resident of Massachusetts and the Defendant is a corporation incorporated in New York with its principal place of business located in California and is thus deemed to be a citizen of New York and California for purposes of this litigation.

B.      This Court of Appeals has jurisdiction of this matter pursuant to *28 U.S. Code § 1291.* This is an appeal from a final judgment by the Federal District Court for the District of Massachusetts.

C.      A final judgment in the district court entered on 7 October 2010. Notice of appeal was filed within 30 days on 7 October 2010.

D.      This appeal is from a final judgment that disposes of all parties' claims.

## STATEMENT OF THE ISSUE PRESENTED FOR REVIEW

Is a lender liable under Massachusetts law for knowingly and intentionally recording and using fraudulent income in a mortgage application and then ignoring such known fraud during its loan underwriting process in order to make a loan that will profit it but that is doomed to lead to foreclosure for the borrower?

## STATEMENT OF THE CASE

This Action was filed on 7 May 2009 in the Suffolk County Superior Court in Massachusetts.  Appendix ("App.") p. 32. On 12 June 2009, Defendant Countrywide Homes Loans, Incorporated ("Countrywide") removed it to the United States District Court for the District of Massachusetts. App. 2, 22. Defendant filed an Answer on 17 June 2009.  App. 2. On 29 April 2010, Countrywide filed a Motion for Summary Judgment.  App. 3, 4, 46. On 24 May 2010, Plaintiff filed an Opposition with a Cross-Motion for Summary Judgment as to liability. App. 4, 5, 386.  On 25 May 2010, Defendant filed a Motion to Strike the Cross-Motion for Summary Judgment that Plaintiff opposed on 7 June 2010. App. 4, 5, 388, 397. A hearing was held on 9 June 2010. App. 9. On 11 June 2010, Countrywide filed a Reply to the Motion for Summary Judgment and Plaintiff filed a Sur-Reply on 17 June 2010.  App.  414, 431. The District Court entered an Order on 7 October 2010 allowing the Defendant's Motion for Summary Judgment, denying the Cross-Motion, and denying the Motion to Strike as moot.  App. 5, 6, 466. Plaintiff filed a Notice of Appeal on 7 October 2010. App. 6, 480.

## STATEMENT OF FACTS

The essential facts of this case based on the admitted facts of the summary judgment exhibits cited *infra* are summarized in the following ¶¶1 - 5:

2

1)     The first subject mortgage of this Action closed on 26 October 2006 for $189,000 on Defendant's loan having a seven year fixed of 6.875% interest only payments that  became an adjustable rate thereafter limited to a maximum of 11.875% — there was no attempt to qualify Plaintiff at a fully amortized rate;

2)     Defendant qualified the Plaintiff for this first loan using fraudulent income created by its employees of $5,563 that according to it created a Debt to Income Ration ("D/I") of 43.64%. Re-calculating this ratio using the Defendant's debt data on the Plaintiff but using the Plaintiff's actual, true, and correct income known to Defendant of $3300 equals a D/I of 73.57%;

3)     Despite Plaintiff's 74% D/I ration, discovery in this Action revealed that 17 days later Countrywide added a 2nd mortgage for a $38,500 equity loan on the Plaintiff's home at a 10.375% fixed rate using up the remainder of any equity in the Plaintiff's home;

4)     Discovery revealed that the exact same Defendant's broker and underwriter approved the Plaintiff for this second equity loan using a new fraudulent income figure of $8,219.25 that according to its records gave the Plaintiff a D/I of 33%. Re-calculating this ratio using the Defendant's debt data but the correct income figure of $3300 equals a D/I of 82.2%;

5)     Thus, it is undisputed that using the Plaintiff's true income that unless real estate values increased, interest rates drastically lowered, and the Plaintiff had a massive income increase that both the initial re-financing loan

and most definitely both loans combined were doomed to failure.

Plaintiff's own Countrywide application disclosure handbook given to the Plaintiff admits itself to be "both a mortgage lender and a mortgage broker under the laws of the Commonwealth of Massachusetts." App. 323. Its employee mortgage broker for the subject loans at issue, Mr. Mamzuska, worked on a straight commission such that he did not get paid unless a loan closed. App. 239.

The two mortgage loans to Plaintiff from Defendant were for a total of $227,500 based on the Defendant's appraisal of $240,000 on Frappier's house that creates a total loan to value ratio of 95%. App. 172, 176, 350-52, 355-56, 358. At the time of foreclosure in 2008, according to Countrywide the property had a fair market value of $359,604.28. App. 365. Given Defendant's appraisal at foreclosure of $359,000, it is a reasonable inference that the Defendant did not care if the loan went into foreclosure because it expected to recover its full value at foreclosure.

Plaintiff discussed his income and asset information with Mamzuska and followed "Mamzuska's orders" as to what information to provide.  Mr. Frappier worked with Mamzuska for months, trusted him, and at one point even had his home and mobile phone numbers to call him with any questions. Any time he had questions, Mamzuska would say "he would take care of it."  Frappier did not use email at the time and thus could not receive copies of any documents via email. Plaintiff never received any loan application to review or sign prior to the 27 October 2006 closing. At the closing, Plaintiff initialed and signed the Application forms during the course of initialing and signing all other forms at the closing for

4

this Mortgage on 27 October 2006 and never saw then again until years later when he got copies of them from the closing attorney as part of the investigation and preparation for this Action. App. 215-21, 229, 233; 304; 307 ¶¶1, 4, & 8.

Plaintiff denies ever stating an income amount greater than the $3300/month that he was actually earning as a part-time janitor at a local Catholic Parish and has no idea how the fraudulent income figures stated in the Defendant's files were calculated. App. 219, 229-30; 304; 307 ¶¶1, 4, & 8. Defendant has admitted that Plaintiff's true income at all material times was in fact $3300/month. App. 67 ¶9.

Though Mamuszka does not really remember Frappier's loan, he stated that his normal procedure was to complete a loan application by phone and that he would enter the data into the computer system. App. 245, 249, 265-66.  At no time did Plaintiff instruct or request Defendant's employee Richard Mamuszka to list his job Position/Title/Type- of-Business as "Operations Mana/Management" for his work as a janitor at Our lady of the Lake Parish on any of the applications for a Mortgage that Defendant's employee Richard Mamuszka completed nor to inflate his income on any such applications. App. 219, 229-30; 304; 307 ¶¶1, 4, & 8. Mamuszka created the description "operations mana/management" listed in the identifier box "Position/Title/Type of Business" on his own accord. Id. Defendant's Underwriting Department failed to verify that any such job title exists, nor is there any comparable title associated with a similar listed employer for Our lady Of The Lake Parish, which is a Church, on salary.com or any similar site. App. 317-320, 355-56, 358-60.  Plaintiff denies ever stating income amount of

$5,563.00 or $8219.25 as listed on the application and Plaintiff has no idea how this figure was calculated. App. 219, 229-30; 304; 307 ¶¶1, 4, & 8.

Discovery revealed that Defendant's employee Richard Marmuszka completed all six loan applications from Frappier that Countrywide had at the material times of this Action being in August of 2006 and that stated income for Mr. Frappier on these application varied from $5273.66 to $8883.31. App. 163-66, 325-28, 330-33, 335-38, 340-43, 345-48. Discovery revealed that as part of the joint application process for loans #3177 and #3185 that Plaintiff submitted with his girlfriend beginning in August 2006, Plaintiff gave Countrywide income documents such as pay stubs and bank statements verifying $1,200 per month earnings as a janitor for the Lady of the Lakes Church plus $2,200.00 per month income for a total monthly income of $3,300. App 219, 304. Defendant also had in its possession multiple authorizations that it requested from Frappier for copies of his income tax records directly from the IRS. App. 362-63. After he gave the Defendant's agents his "pay stubs, tax returns, bank statements", the new financing plan was not one loan but became "as soon as I got my first mortgage he could within a few weeks get me a second mortgage." App. 308.

On 23 October 2006 Defendant's employee underwriter Angelique Jamieson requested a Structured Loan Desk Exception Summary that listed Plaintiff's monthly income as $8,219.25. App. 355-56. Plaintiff denies ever providing an income amount of $8,219.25 to any employee of Defendant Countrywide Home Loans, Inc., and Plaintiff has no idea how this figure was calculated. App. 219,

6

229-30; 304; 307 ¶¶1, 4, & 8. Defendant's records reveal that this underwriter Jamieson was involved along with Marmuszka in all applications, events, and closing from 4 October 2006 onward including the income statements that varied from $5563 to $8883.31.  App. 345-48, 350-53, 355-56, 358-60. On October 24, 2006 Defendant's Employee Angelique Jamieson printed out the Uniform Underwriting and Transmittal Summary that she prepared containing a total monthly income amount of $5,563.00. App. 358-60. On November 17, 2006 Defendant Employee Richard Mamuszka completed a second mortgage application for Plaintiff for the amount of $38,500.00 as an equity loan for the subject property. App. 350-53. Mamuszka listed income for Plaintiff of $8,883.00. App. 351. Documents for this loan were also prepared by Defendant's underwriter employee Angelique Jamieson. App. 350.

According to Defendant's underwriting department records, at no point did they try to verify that Frappier's job title exists; if there is any comparable title associated with a similar listed employer, which is a Church; and failed to notice or intentionally ignored that the stated income was 70% greater than just 3 weeks before in its own records. App. 355-56, 358-60. Plaintiff denies ever providing an income amount of $8,883.00 to any employee of Defendant Countrywide Home Loans, Inc., and Plaintiff has no idea how this figure was calculated.  App. 219, 229-30; 304; 307 ¶¶1, 4, & 8.

As with the first loan, there is no proof that any truth-in-lending disclosures for the equity loan were served upon Frappier within the required three days, but in

fact the application and the required disclosures are dated and were part of the dozens of documents given Frappier blindly to sign at the closing on 13 December 2006 without an opportunity to review consistent with his testimony. App. 215-21, 229, 233; 304; 307 ¶¶1, 4, & 8; 352.

Plaintiff testified that he gave Defendant Employee Richard Mamuszka pay stubs from Hampden County, pay stubs from the church, and two years worth of taxes. App 219; 304; 262. Thus, Defendant's employees Mamuszka and Jamieson among other employees at Defendant who individually and collectively prepared and reviewed Plaintiff's six loan application between 20 August 2006 and 17 November 2006 were in possession of pay stubs and tax returns that were required by Defendant and that gave his true income of $3300/month maximum.

The stated income of $5,563 as an "operations manager" for a Parish Church was clearly not reasonable — and would be ridiculous if stated for Plaintiff's true job as a part-time janitor at a Catholic church. App 317-20. Utilizing an internet search of salary.com and indeed.com for this position in the same geographic region as was required by the Defendant's own procedures, there was no record for this position at either web site. Id. Defendant qualified the Plaintiff first using fraudulent income created by its employees of $5,563 that according to it created a Debt to Income Ration ("D/I") of 43.64%; re-calculating this ratio using the Defendant's debt data on the Plaintiff but using the Plaintiff's actual, true, and correct income known to Defendant of $3300 equals a D/I of 73.57%. App. 358. Discovery revealed that the exact same Defendant's broker and underwriter then

8

approved the Plaintiff for a second equity loan using a new fraudulent income
figure of $8883.31 that is listed in the underwriting records as $8,219.25 and that
according to its records gave the Plaintiff a D/I of 33%; re-calculating this ratio
using the Defendant's debt data but the correct income figure of $3300 equals a D/I
of 82.2%. App. 351; 355.

## SUMMARY OF THE ARGUMENT

This is a diversity case in which Massachusetts Law applies, such includes
statutory, regulatory, and common law duties. In Massachusetts, the public policy
is to prohibit and prevent predatory lending that is defined as "a home mortgage
loan secured by the borrower's principal dwelling that the lender reasonably
expects will fall into default" and to make such lending an unfair and deceptive
practice in violation of Massachusetts law. Such public policy cannot be enforced
and in fact would be defeated in practice by placing a legal duty on borrowers to
catch fraud by lenders in their lending procedures or to excuse such fraud because
a borrower failed to catch fraud by lenders. Such placing of a legal duty on the
borrower as the District Court did here would in practice defeat Massachusetts'
goal to prohibit and stop predatory lending: borrowers focused on hopes for a
better life want the loans for which they are applying even though they cannot
afford them, but in the interest of avoiding the financial strain on society of such
lending that is profitable to banks during rising real estate markets and costly to

9

society when the tide turns, the Massachusetts Legislature, its bank regulators, and

its Supreme Judicial Court have created a duty for lenders — not a duty for

borrowers — to avoid such loans.

In this Action, because of a divorce, Plaintiff in mid to late 2006 was placed

into the emotionally and financially difficult position of trying to either save his

home by a re-financing or to save the equity by a sale. Dealing with Plaintiff's real

income of $3300/month and only with the re-finance first mortgage of $189,000

that had a monthly payment of $1700 plus other debts (these other debts were

ignored by the District Court), Plaintiff's D/I was over 75% according to

Defendant's own records. Despite Plaintiff's D/I, 17 days after the closing on the

first mortgage, Countrywide added a 2nd mortgage of $38,500 at 10+% interest

using up the remainder of any equity to give the Plaintiff a monthly payment of

$2,050/month plus other debts (again, ignored by the District Court) on $3,300

income representing a 82% D/I percentage.  The two mortgage loans equal

$227,000 based on the Defendant's appraisal of $240,000 on Frappier's house that

creates a loan to value ratio of 95%.  Though Plaintiff made the emotional decision

to save his home by re-financing with the Defendant, the reality was that unless

real estate values increased and interest rates drastically lowered and the Plaintiff

had a massive increase in income, the Plaintiff's attempt to save his home was

doomed to failure from the outset. Given Defendant's appraisal of the subject

property at foreclosure in 2008 of $359,000, it is a reasonable inference that the

Defendant did not care if the loan failed because it expected to recover its full

10

value even if it had to foreclose. The Employee broker was paid his commissions a month after closing, he definitely did not care.

In order to avoid such a prohibitive D/I ratio that would not qualify the Plaintiff and prohibit a loan to the Plaintiff and thus cause the loss of any commissions and profits associated with lending to Plaintiff, Defendant's employees — paid by commission — fraudulently listed Plaintiff's income on the loan application and underwriting documents at various times as either $8,219.25 or $5,563.00. Defendant failed to give the Plaintiff the application forms with the fraudulent income to review before the closing but was such fraudulent records were given to him blindly to sign in a pile without review at the closing.

Though such fraud is a disputed fact in this Action, it is undisputed that the Defendant's employees throughout the material time period of this Action (at least 30 August 2006 - 13 December 2006) had multiple records that they in fact reviewed, prepared, and printed out stating different income for the Plaintiff varying by 70% from $5,273.66 to $8,882.31 within a couple of weeks with no reason.  Despite this 70% unexplained discrepancy in income, no one at Defendant checked to see if there is such a job as "operations manager" at a local parish church or that such a job could possibly earn income in excess of $60,000.00/year.

**STANDARD OF REVIEW**

The standard of review for summary judgment decisions is *de novo*;

Summary judgment is appropriate only when there is no genuine dispute as to material facts and thus the moving party is entitled to judgment as a matter of law. *Fenton v. John Hancock Mutual Life Insurance Company*, 400 F.3d 83, 87 (1st Cir. 2005); *GTE Wireless Incorporated v. Cellexis International Incorporated,* 341 F.3d 1, 4 (1st Cir. 2003).

## ARGUMENT

I.    THE DISTRICT COURT EXHIBITED A FACTUAL AND LEGAL MISUNDERSTANDING OF THE NATURE OF PREDATORY LENDING THAT NEEDS TO BE REVERSED AND CLARIFIED BY THIS COURT GIVEN THE PUBLIC POLICY AT ISSUE.

The District Court's reasoning in its summary judgment decision is full of factual errors and inferences made in Defendant's favor. It emphasizes that the first mortgage at issue is essentially the same as the prior financing on the subject property but ignores the fact that the prior financing — in fact, even the initial application for the subject loan — has two income earners, the Plaintiff and his wife or girlfriend, whereas Plaintiff was now trying to save his home on his own. App. 77, 84, 131, 214-15, 325, 330, 335, 340,  The Court seems to give no significance to the fact that the Plaintiff testified that after he gave the Defendant's agents his "pay stubs, tax returns, bank statements" that the new financing plan was not one loan but became "as soon as I got my first mortgage he could within a few weeks get me a second mortgage."  App. 308.The Court ignored the fact that

12

Plaintiff's D/I ratio using the Defendant's own figures just on the first loan when considering his true income and debts (not just the loan amount and stated income without consideration of other debts) is 75% and becomes 82% when the second mortgage from the Defendant is considered, far above the highest acceptable D/I ratio of 38% and above the ration upon which he was qualified for the first loan by the Defendant of 43% that itself uses the fraudulent income of $5500 that is itself than fraudulently increased to >$8000 apparently to get the second loan through. *See* Statement of Facts *supra*.

What is worse, the District Court ignored the legal effect and adverse inference against the Defendant that was suppose to be made by the undisputed fact that the Defendant was adding another loan to a series of re-financing of the Plaintiff's property:

> (a)     A lender shall not knowingly make a home loan if the home loan pays off all or part of an existing home loan that was consummated within the prior 60 months or other debt of the borrower, unless the refinancing is in the borrower's interest.  The "borrower's interest" standard shall be narrowly construed, and the burden is upon the lender to determine and to demonstrate that the refinancing is in the borrower's interest. *M.G.L.c. 183, §28C.*

Such serial re-financing is suppose to greater a further duty and burden upon the Defendant to justify its loan not serve as an excuse for predatory lending.

The undisputed truth is that the Plaintiff was foolish, naive, and maybe acting irrationally to believe that he could save his home from the effects of his divorce by getting into a loan that would require him without doubt to pay >75% of his income to debtors and 50% of his income to the Defendant and perhaps more after the introductory rate expires. If the Court were to reverse the standard of

13

review for summary judgment so as to make inferences in favor of the Defendant as the District Court did, it could conclude that the Plaintiff fraudulently ignored or stated false high income in an irrational attempt to save his home. However even if such inference is true, it would be immaterial to Defendant's liability for predatory lending. As a matter of law, the Plaintiff has no legal duty to check for fraud or even errors in Defendant's work, especially by its own employees. Consumers/buyers are risking nothing but their own money and work. For obvious reasons, given the billions of dollars of other people's money and the taxpayers' money with which lenders such as the Defendant gamble to maximize their profits, in Massachusetts the Legislative branch of government, the Executive Branch, and the Supreme Judicial Court have given Defendant and all lenders specific legal duties to avoid what happened in this case. It is important that this Court review the facts *de novo* so as not to ignore the work of all three branches of Massachusetts government as the District Court did in its Decision.


A.  Massachusetts Law without doubt creates a standard of care and duty for the Defendant to avoid fraud and not to ignore fraud in its underwriting that was applicable to the Defendant at all material times of this Action.


As this Court reviews the facts, the Court must use the methodology set out by the Massachusetts Supreme Judicial Court in  Commonwealth v. Fremont Investment and Loan, 452 Mass. 733 (2008) in order to achieve an understanding of the applicable law governing the Defendant's lending practices that are at issue in this Action. Just as in *Fremont*, the Defendant here is arguing that much of the

14

cited statutory and regulatory law that it violated are not applicable to the facts of this case or did not exist in written regulatory form in 2006 when the subject loans occurred; just as in *Fremont* such argument must be rejected because the written regulatory law is simply a formalization of the required standard of care and associated legal duties of the required standard of care that existed long before 2006. Admittedly not all of the applicable law directly creates liability for the Defendant, but it all serves to either establish a genuine issue of material fact for summary judgment purposes or to create an undisputed issue of fact on liability.

Negligent underwriting is a valid claim in light of *Fremont* and the numerous statutory and regulatory standards upon which *Fremont's* common law analysis and methodology is based.  *Fremont* imposes a duty on mortgage lenders to insure that borrowers have the financial means to repay its loans. Even if *Fremont* did not expressly address the underwriting duties alleged in this case, the SJC's methodology makes clear that evolving standards governing lenders (such as the underwriting standards contained in *940 CMR 8.05, 8.06; 209 CMR 53.03, 53.05*) can be found even in regulatory and statutory provisions that may be inapplicable to the transaction being litigated. Among other things, the SJC points to a variety of federal and state regulatory guidelines and pronouncements on predatory lending even though those guidelines were not issued at the time of the lending practices at issue nor under *G.L. c. 93A*. *Fremont*, 452 Mass. at 744-747. Most importantly, the *Fremont* Court finds standards governing lenders in *G.L. c. 183* cases of high cost loans to be applicable to all loans even though *Chapter 183*

15

did not apply to the transactions at issue in *Fremont*. *Fremont*, 452 Mass. at 744-

747. The Court concluded:

> Fremont's mortgage loans were not "high cost home mortgage loans"
> governed by *G.L. c. 183C*, as the [trial court] judge recognized. Fremont
> contends, however, that the judge improperly interpreted c. 183C to reach
> Fremont's loans, and thereby violated basic rules of statutory construction
> that prohibit inferring a legislative intent to reach conduct that the statute's
> unambiguous language clearly does not cover. Fremont's argument lacks
> merit. Even though the loans have different  terms from Fremont's, the
> conduct the act prohibits, and deems a violation of G.L. c. 93A, is similar to
> the central element of unfairness the judge found in Fremont's lending
> practices: the origination of a home mortgage loan that the lender should
> recognize at the outset the borrower is not likely to be able to repay. See
> G.L. c. 183C, § 4. That the Legislature chose in the act to focus specifically
> on home loan mortgages with different terms and features from Fremont's is
> not dispositive; the question is whether the act may be read to establish a
> concept of unfairness that may apply in similar contexts. As stated by the
> single justice of the Appeals Court, the judge appropriately could and did
> "look to Chapter 183C as an established, statutory expression of public
> policy that it is unfair for a lender to make a home mortgage loan secured by
> the borrower's principal residence in circumstances where the lender does
> not reasonably believe that the borrower will be able to make the scheduled
> payments and avoid foreclosure." *Id.*

*Chapter 183, § 28C* plainly expresses a legislative belief that lenders owe a

duty of care to consumer borrowers to avoid making unsuitable loans. The

regulation, *209 C.M.R. § 53.05*, is the Division of Banks' expression of that

standard. It provides "a lender shall use sound underwriting practices which are

reasonable in relation to the home loan requested."  *940 CMR 8.05, 8.06* is the

Attorney General's expression of the same standard.

In Massachusetts, because its truth-in-lending requirements meet or exceed

federal truth-in-lending requirements ("TILA"), the truth-in-lending disclosures

("TIL") required in Massachusetts consist of the state law truth-in-lending

requirements of *M.G.L.c. 140D ("CCDA")*. *Belini v. Washington Mutual Bank, FA,* 412 F.3d 17, 20-23 (2005); *15 U.S.C. § 1633*; *12 C.F.R. Pt.226, Supp. 1.* The required disclosures of CCDA are TIL disclosures in Massachusetts because they are the same or complement those required by TILA and violations of CCDA are treated as violations of TILA. Id.. *Belini*, at 26-27; *See 12 C.F.R. § 226.29(b)(2)* 2.

"A violation of this chapter [CCDA], or any rule or regulation issued thereunder, shall constitute a violation of chapter ninety-three A". Id. §34.

Furthermore, all required truth-in-lending disclosures are to be made "before the credit is extended, or shall be delivered or placed in the mail not later than three business days after the creditor receives the consumer's written application, whichever is earlier." M.G.L.c. 140D, §12(b)(2). "Written acknowledgment of receipt of any disclosures required under this chapter, or any rule or regulation issued thereunder, by a person to whom information, forms, and a statement is required to be given pursuant to this section does no more than create a rebuttable presumption of delivery thereof." Id. *§10 ( c).*

Such requirements disallow the Defendant's argument that simply because Plaintiff signed the pile of documents at closing that may have included CCDA truth-in-lending disclosures that such negates any liability for fraud by Defendant in those disclosures. Defendant's own records establish that all the required disclosures were signed at the closing just as the Plaintiff testified without any opportunity for him to look or review any of them for fraud or for anything. The Defendant's lack of proof of timely service of required TILA disclosures within the

17

required three days serves to further rebut the rebuttable presumption of *§10( c)* and supports Plaintiff's testimony that the only existing signed copies were given to him and signed at the closing dates along with dozens of other documents with no opportunity to read or review them and without copies given to him for review.

Though not specifically written until 2008, the following duties are simply written regulatory standards exemplifying the standard of care required of the Defendant since long before the 2006 time period at issue with emphasis added:

--- *Massachusetts Administrative Code, 940 CMR., Office of the Attorney General,*
*940 CMR 8.00.  Mortgage Brokers and Mortgage Lenders*:
§ 8.05.Mortgage Disclosures
(1)    It is an unfair or deceptive act or practice for a mortgage broker or mortgage lender to fail to make any disclosure, or fail to provide any document, to a consumer required by and at the time specified by any applicable state or federal law, regulation or directive.

(2)    **It is an unfair or deceptive act or practice for a mortgage broker or lender to conceal or to fail to disclose to a borrower any fact relating to the loan transaction, disclosure of which may have influenced the borrower not to enter into the transaction with the broker or lender.**

(3)    It is an unfair and deceptive act or practice for the mortgage broker or lender to fail to take reasonable steps to communicate the material facts of the transactions in a language that is understood by the borrower. Reasonable steps which shall comply with 940 CMR 8.00 may include but shall not be limited to:
...

**§ 8.06.Prohibited Practices**

(1)    It is an unfair or deceptive act or practice for a mortgage broker or lender to make any representation or statement of fact if the representation or statement is false or misleading or has the tendency or capacity to be misleading, or if the mortgage broker or lender does not have sufficient information upon which a reasonable belief in the truth of the representation or statement could be based.  Such claims or representatives include, but are not limited to the availability, terms, conditions, or charges, incident to the

mortgage transaction and the possibility of refinancing.  In addition, other such claims and representations by the broker may include the amount of the brokerage fee, the services which will e provided or performed for the brokerage fee, the borrower's right to cancel any agreement with the mortgage broker, the borrower's right to a refund of the brokerage fee, and the identity of the mortgage lender that will provide the mortgage loan or commitment.
...

(11)   It is an unfair or deceptive act or practice for a mortgage broker to arrange or mortgage lender to make a mortgage loan unless the mortgage broker or lender, based on information known at the time the loan is made, reasonably believes at the time the loan is expected to be made that the borrower will be able to repay the loan based upon a consideration of the borrower's income, assets, obligations, employment status, credit history, and financial resources, not limited to the borrower's equity in the dwelling which secures repayment of the loan (subject, however, to the treatment of No Income Loan Products in 940 CMR 8.06(16)).  The determination under 940 CMR 8.06(15) of a borrower's ability to repay a loan shall take into account, without limitation:

**(a) the borrower's ability to repay at the fully indexed rate, assuming a fully amortizing repayment schedule, and the resulting scheduled payments that may be charged under the loan accounting for interest rates, financial terms or scheduled payments that may adjust upward; and**

**(b) the property taxes that are required on the subject property at the time the loan is expected to be made and the reasonably anticipated insurance costs if the loan requires that insurance be maintained on the property, regardless whether the broker or lender will collect an escrow for such taxes or insurance in connection with loan payments.**

For purposes of 940 CMR 8.06(15)(a), the "fully indexed rate," with respect to loan rates that may adjust upward, shall mean the index rate prevailing at the date of loan origination plus the margin to be added to it after the expiration of an introductory interest rate.  For purposes of illustration, assume that a loan with an initial fixed rate of 7% will reset to the six-month London Interbank Offered Rate (LIBOR) plus a margin of 6%.  If the six-month LIBOR rate equals 5.5% at the date of origination, the determination of ability to pay under 940 CMR 8.06(15)(a) shall take into account the borrower's ability to repay at 11.5% (5.5% plus 6%), regardless of any interest rate caps that limit how quickly the fully indexed rate may be reached.

...

**(16)   It is an unfair or deceptive act or practice for a mortgage broker or lender to process or make a mortgage loan without documentation to verify the borrower's income (a so-called "no documentation," "no doc," "stated income" or "limited documentation" loan) unless the broker or lender, as applicable, first provides a written document to the borrower, which must be signed by the borrower in advance of the closing, and which:**

(a) identifies the borrower's income and the source of the income; and

(b) provides detailed information, if true, that by applying for a mortgage loan on a no- or limited documentation basis, the consumer will pay a higher interest rate or increased charges, or have less favorable terms for the mortgage loan (including information concerning the precise increase in interest rate, charges, or the nature of the less favorable terms).

Provided, however, that if a mortgage broker or lender arranges or makes a mortgage loan using a No Income Loan Product, which loans shall remain subject to 940 CMR 8.06(15), the requirement in 940 CMR 8.06(16)(a) shall not apply.  It is an unfair or deceptive act or practice for a mortgage lender or broker to process or make a mortgage loan on a no- or limited documentation basis if the stated income provided by the borrower with respect to the no- or limited documentation loan contradicts information previously obtained by the broker or lender with respect to that borrower in connection with the same proposed loan, absent a document change in circumstances or other documented explanation for the discrepancy between the prior information and latter income representation.  Notwithstanding the foregoing, it shall be an unfair or deceptive act or practice for a mortgage lender to underwrite or close a loan without first verifying the employment or income of the borrower when the amount of the income stated is not reasonable for the actual employment status or experience of the borrower known to the lender, or when the borrower's stated employment or stated income is not reasonable in light of the borrower's circumstances known to the lender.

(17)   It is an unfair or deceptive act or practice for a mortgage broker to process, make or arrange a loan that is not in the borrower's interest.  Where the financial interest of a mortgage broker conflicts with the interests of the borrower (for example, where the broker's compensation will increase directly or indirectly if the borrower obtains a loan with higher interest rates, increased charges or less favorable terms than those for which a borrower would otherwise qualify), the broker shall disclose the conflict and shall not

20

proceed to process, make or arrange the loan so long as such a conflict exists. It is an unfair or deceptive act or practice for a mortgage broker to disclaim the duty established by 940 CMR 8.06(17) in a written contract or to assert in oral representations that a broker does not have such a duty in communications with the borrower.

— Determination and Documentation of Borrower's Interest, *209 CMR § 53.05*. Underwriting Standards:

In making a home loan in which a determination under 209 CMR 53.04 that the home loan is in the borrower's interest is required, a lender shall use sound underwriting practices which are reasonable in relation to the home loan requested.

In October 2006, the federal government issued an advisory attached as

Exhibit GG in the summary judgment filings, Appendix p. 367 *et seq,* that among

other warnings stated beginning at p. 58613 (App. 371) with emphasis added:

>   Many of these nontraditional mortgage loans are underwritten with less stringent income and asset verification requirements ("reduced documentation") and are increasingly combined with simultaneous second lien loans. Such risk layering, combined with the broader marketing of nontraditional mortgage loans, exposes financial institutions to increased risk relative to traditional mortgage loans.
>
>   Given the potential for heightened risk levels, management should carefully consider and appropriately mitigate exposures created by these loans. To manage the risks associated with nontraditional mortgage loans, management should:

>   • Ensure that loan terms and underwriting standards are consistent with prudent lending practices, including consideration of a borrower's repayment capacity;

>   • Recognize that many nontraditional mortgage loans, particularly when they have risk-layering features, are untested in a stressed environment. As evidenced by experienced institutions, these products warrant strong risk management standards, capital levels commensurate with the risk, and an allowance for loan and lease losses that reflects the collectability of the portfolio; and

- **Ensure that consumers have sufficient information to clearly understand loan terms and associated risk prior to making a product choice.**

...

**Furthermore, the analysis of repayment capacity should avoid over-reliance on credit scores as a substitute for income verification in the underwriting process.  The higher a loan's credit risk, either from loan features or borrower characteristics, the more important it is to verify the borrower's income, assets, and outstanding liabilities.**

...

***Reduced Documentation*** **- Institutions increasingly rely on reduced documentation, particularly unverified income, to qualify borrowers for nontraditional mortgage loans.  Because these practices essentially substitute assumptions and unverified information for analysis of a borrower's repayment capacity and general creditworthiness, they should be used with caution.  As the level of credit risk increases, the Agencies expect an institution to more diligently verify and document a borrower's income and debt reduction capacity.  Clear policies should govern the use of reduced documentation.  For example, stated incomes should be accepted only if there are mitigating factors that clearly minimize the need for direct verification of repayment capacity.  For many borrowers, institutions generally should be able to readily document income using recent W-2 statements, pay stubs, or tax returns.**

*Simultaneous Second-Lien Loans* – Simultaneous second-lien loans reduce owner equity and increase credit risk.  Historically, as combined loan-to-value ratios rise, so do defaults.  A delinquent borrower with minimal or no equity in a property may have little incentive to work with a lender to bring the loan current and avoid foreclosure.  In addition, second-lien home equity lines of credit (HELOCs) typically increase borrower exposure to increasing interest rates and monthly payment burdens.  Loans with minimal or no owner equity generally should not have a payment structure that allows for delayed or negative amortization without other significant risk mitigating factors.

Federal HOEPA and the associated CFR *Title 12, §§226.34 & 226.35* are a

further example of the standard of care established by multiple state and federal

regulations and by case law that the Defendant has breached. The subject loan and facts revealed in discovery are not governed by HOEPA but again such is immaterial to the issue of whether the standard of care exemplified by HOEPA and by other regulations exists.

> B.    The reasonable inference from the facts is that fraudulent income was used or ignore by Defendant's employees to avoid the Plaintiff's >75% D/I.

It is a disputed issue of fact in this Action as to whether the Defendant's agent or agents fraudulently increased the Plaintiff's stated income on his loan applications. The inference that should be made from the facts is that fraud was used by Defendant's employees to get a loan through and such inference itself should avoid summary judgment for the Defendant.

However, discovery on this issue has revealed that it is undisputed that in the Defendant's loan activity leading up to, during, and after the loan application process the Defendant without doubt knew of facts that not only discredited the subject stated income but that showed it to be wrong. Just in one two-week period prior to closing on planned financing that used up almost all of the Plaintiff's equity in his home, Defendant's own records produced by its exact same broker and underwriter showed a stated income discrepancy of 70%. Defendant did nothing about this discrepancy. Defendant has admitted in ¶9 of its *Rule 56.1* Statement of Facts that Plaintiff's actual income at the material times was "$1200 per month as a janitor at Our Lady of the Lake Parish ... In addition, Mr. Frappier

received retirement income in the amount of $2100 per month." App. 67. Thus, it is undisputed that Plaintiff's D/I ration was in excess of >70% (how much in excess is dependent on which of the fraudulent/incorrect stated incomes are used) and was nowhere near the 33% or 43% DTI ratio used to qualify him for any loan.

Defendant's argument is that such admitted stated income errors in its own records are meaningless because it has no legal duty to do anything about such errors, that it is entitled to rely completely and wholly on what the consumer states the income to be; according to it, even if a consumer gives it "tax forms, W-2 forms, or pay stubs" (as Plaintiff claims he did in this case) that its agents would not look at them and that they have and had no obligation to look at such regardless of the fact that they may disagree with its stated income records. App. 68 ¶15. Defendant is completely wrong on this issue. Defendant most definitely had a duty to act on the errors in its own records. Such duty was explicitly stated in Commonwealth v. Fremont Investment and Loan, 452 Mass. 733 (2008). One of the ways that the Supreme Judicial Court in Fremont explicated this duty was by analogy from the standards established by the Legislature in *M.G.L.c. 183C, §2,* a state law that "mirrors HOEPA." In re Laudani, 401 B.R. 9, 34 & n. 19 (D.Mass. 2009).

> Although the Defendants' loan may not be proscribed by the Massachusetts
> Predatory Home Loan Practices Act, it nevertheless may violate Mass. Gen.
> Laws ch. 93A. *See Commonwealth of Massachusetts v. Fremont Investment
> and Loan*, 452 Mass 733, 749, 897 N.E. 2d 548, 560 (2008) ("the judge
> appropriately could and did 'look to Chapter 183C as an established,
> statutory expression of public policy that it is unfair for a lender to make a
> home mortgage loan secured by the borrower's principal residence in
> circumstances where the lender does not reasonably believe that the

24

borrower will be able to make the scheduled payments and avoid foreclosure.'"). In re Laudani, 401 B.R. 9, n. 19 (D.Mass. 2009).

Federal HOEPA and the associated CFR *Title 12, §§226.34 & 226.35* referenced at oral argument are simply other examples to be added to the numerous other examples of state and federal law argued in Plaintiff's summary judgment memorandum establishing the legal duty and standard of care requiring Defendant to be attentive to its own records but that the Defendant argues it does not have and never had — a duty and standard of care that Plaintiff submits Defendant has breached as a matter of law given the undisputed admitted facts by Defendant.

The undisputed facts establish that the Defendant through multiple employees knew or should have known that the subject loans to the Plaintiff were structured to fail. Based on Defendant's expectation of a rising real estate market, it did not really care whether or not the subject re-finance and piggyback equity loans will fail because it expected to profit regardless and thus ignored its employees' recording of a 70% income discrepancy. It is undisputed that the Defendant's employees throughout the material time period of this Action (30 August 2006 - 13 December 2006) had multiple records that they in fact reviewed, prepared, and printed out stating different income for the Plaintiff varying by 70%. Defendant's employee Mamuszka was involved in all of the material documents. In fact, during the material events between the closing of the re-finance loan on 27 October 2006 and the planned application for the equity loan on 17 November 2006 that allowed Defendant to use up the remainder of the equity on Plaintiff's

25

home, Defendant's underwriter had multiple records explicitly showing this 70% discrepancy in stated income with it varying from $5,273.66 to $8,882.31 within a couple of weeks with no reason.  Despite this 70% unexplained discrepancy in income, no one at Defendant checked to see if there is such a job as "operations manager" at a local parish church or that such a job could possibly earn income in excess of $60,000.00 a year.


II.    **BASED ON THE SUPREME JUDICIAL COURT'S ANALYSIS, DEFENDANT AS A MATTER OF LAW BREACHED A LEGAL DUTY ESTABLISHED BY STATUTE, REGULATION, AND THE COMMON LAW AND SUCH BREACH IS AS A MATTER OF LAW AN UNFAIR AND DECEPTIVE ACT THAT IT, NOT THE PLAINTIFF HAD, A DUTY TO PREVENT.**

Defendant's out-of-context citation to a portion of the Massachusetts Superior Court case of Commonwealth v. Fremont Investment and Loan, 2008 WL 517279, is inapposite to this Action because in that case the fraud was committed by independent contractors over whom the lender had no control nor were there any stated facts giving the lender any knowledge or notice of the fraud these independent contractors were committing on their paperwork. Id. at p. 3-4. It should be noted that even in such a case dealing with independent contractors, the lender's employee underwriters did at least "compare the salary stated with the salary typical for such an occupation in the geographic area, using data obtained from salary.com." Id. This is not the case here.  It is undisputed that the relevant documents were all prepared, reviewed, and printed out by Defendant's employees.

26

Despite the 70% discrepancy in stated income, no one did anything.

> A.   Regardless of whether it occurred negligently or intentionally, Defendant is liable for ignoring a 70% discrepancy in its prepared, reviewed, and printed income records and a >70% D/I that served essentially to use up Plaintiff's entire equity to maximize Defendant's profits.

Whether Defendant's employees acted fraudulently is relevant solely to the issue of punitive damages under *G.L.c. 93A, §9*, such is a different issue from whether the Defendant is liable for violation of *Chapter 93A.*

*G.L. c. 93A §2* makes unlawful any "unfair or deceptive acts or practices in the conduct of any trade or commerce." *Kattur v. Demoulas*, 433 Mass. 1, 12, 739 N.E.2d 246 (2000), quoting *Commonwealth v. DeCotis*, 366 Mass. 234, 244 n. 8, 316 N.E.2d 748 (1974).  The statute does not define unfairness, recognizing that "[t]here is no limit to human inventiveness in this field."  *Kattar v. Demoulas, supra* at 13, 739 N.E.2d 246,  quoting *Levings v. Forbes & Wallace, Inc.,* 8 Mass.App.Ct. 498, 503, 396 N.E.2d 149 (1979).  What is significant is the particular circumstances and context in which the term is applied.  See *Kerlinsky v. Fidelity & Deposit Co.*, 609 F.Supp. 1112, 1119 (D.Mass.1987), aff'd, 843 F.2d 1383 (1st Cir. 1988).  A practice may be deemed unfair if it is "within at least the penumbra of some common-law, statutory, or other established concept of unfairness."  *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596, 321 N.E.2d 915 (1975);  See *Milliken & Co. v. Duro Textiles, LLC*, 451 Mass. 547, 562-563, 877 N.E.2d 244 (2008), and cases cited.

27

In Massachusetts, consistent with federal law requirements as shown in the *Federal Register* published standards of the U.S. Treasury in <u>Appendix</u> pp. 367-76 for example, a lender has a duty not "to issue a home mortgage loan secured by the borrower's principal dwelling that the lender reasonably expects will fall into default", commonly called a duty to avoid "predatory lending" , a term that refers to loans that are structured to fail and thus result in foreclosure; such predatory lending is an unfair and deceptive act in violation of *M.G.L.c. 93A*. <u>Commonwealth v. Fremont</u>, 452 Mass. 733, 739-40 (2008). Predatory loans are "doomed to foreclosure" unless the borrower can refinance the loan, however such re-financing is dependent on a continuing rising real estate market  because if housing prices remain steady or decline, a borrower with a mortgage loan having a loan-to-value ratio of close to one hundred per cent could not have the equity or financial capacity to obtain a new loan. <u>Id.</u> To issue a home mortgage loan whose success relies on the hope that the fair market value of the home will continue to rise is as unfair as issuing a home mortgage loan whose success depends on the hope that the borrower's income will increase during that same period. <u>Id.</u>

Well before 2006, State along with Federal regulatory agencies explicitly warned lending institutions making subprime loans that even if they were in compliance with federal banking-specific laws and regulations and were "underwrit[ing] loans on a safe and sound basis, [their] policies could still be considered unfair and deceptive practices" under *G.L. c. 93A*. <u>Fremont</u>, *supra* at 744; *Consumer Affairs and Business Regulation, Massachusetts Division of Banks,*

28

*Subprime Lending* (Dec.10, 1997).  In 2001, an interagency Federal guidance published January 31, 2001, jointly by the OTS, Office of the Comptroller of the Currency (OCC), and the Board of Governors of the Federal Reserve System, the FDIC stated: "Loans to borrowers who do not demonstrate the capacity to repay the loan, as structured, from sources other than the collateral pledged are generally considered unsafe and unsound."  *Fremont*, supra *citing* "Expanded Guidance for Subprime Lending Programs at 11 (Jan. 31, 2001); see also Interagency Guidance on Subprime Lending at 5 (March 1, 1999); Interagency Guidance on High LTV [Loan-To-Value] Residential Real Estate Lending at 6 (Oct. 8, 1999); OCC Advisory Letter, Guidelines for National Banks to Guard Against Predatory and Abusive Lending Practices, AL-2003-2 at 1 (Feb. 21, 2003); Unfair or Deceptive Acts or Practices by State-Chartered Banks (Mar. 11, 2004) (FDIC); Interagency Guidance on Nontraditional Mortgage Product Risks, 71 Fed.Reg. 58,609, 58,617 (Oct. 4, 2006)."

"When a lending institution's practices are deemed unsafe and unsound because they create too high a risk of default and foreclosure, the borrower obviously faces the same risk." Fremont at 755.  Accordingly, such lending practices indicate unfairness under *G.L. c. 93A*. Id.  Fremont cites to and quoted Federal regulators in 2003 as warning:

> When a loan has been made based on the foreclosure value of the collateral, rather than on a determination that the borrower has the capacity to make the scheduled payments under the terms of the loan, based on the borrower's current and expected income, current obligations, employment status, and other relevant financial resources, the lender is effectively counting on its ability to seize the borrower's equity in the collateral to satisfy the obligation

29

and to recover the typically high fees associated with such credit. "[S]uch disregard of basic principles of loan underwriting lies at the heart of predatory lending …." Id. quoting OCC Advisory Letter, Guidelines for National Bank to Guard Against Predatory and Abusive Lending Practices, AL 2003-2 at 2 (Feb. 21, 2003).

Thus, federal regulators long before 2006 were discussing "predatory" lending as part of an analysis of the OCC's enforcement powers under § 5 of the Federal Trade Commission Act, the Federal analog to *G.L. c. 93A*. Id. The guidance notes that the same rules may be enforced against other banks by other agencies and the guidance was issued in response to "inquiries as to whether state laws and local initiatives addressing certain types of abusive lending practices" applied to national banks. Id.

In *Commonwealth v. Fremont Investment & Loan,* 452 Mass. 733 (2008), the Supreme Judicial Court stated at least three times that is unfair for a mortgage lender to make a loan it knows the borrower cannot repay. *Fremont*, 452 Mass. at 743 ("…originating loans with terms that in combination would lead predictably to the consequence of the borrowers' default and foreclosure, are within established concepts of unfairness…in violation of G.L. c. 93A); *Fremont*, 452 Mass. at 745-46 (noting that the record showed that Fremont made no effort to determine whether borrowers could afford its loans, and that it was unreasonable, and unfair to the borrower, for Fremont to structure its loans on "unsupported optimism" that housing prices would improve and that unaffordable loans could be refinanced); *Fremont*, 452 Mass. at 748-49 (originating mortgage loans that the lender should recognize at the outset the borrower is not likely to be able to repay violates

30

Chapter 93A).

### III.    UNJUST ENRICHMENT AND BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING DAMAGES EXIST.

With respect to the unjust enrichment claim, Defendant is incorrect to say that under Massachusetts law no claim for unjust enrichment will lie whenever a contract is at issue. The question is not whether there is a contract but rather whether there is an adequate remedy at law under the contract for damages. Under Massachusetts law a Plaintiff alleging unjust enrichment need only show: "First, a benefit or enrichment was conferred upon the defendant ...; second, the retention of that benefit or enrichment resulted in a detriment to [the plaintiff]; and, third, there are circumstances which make the retention of that benefit ... unjust." *Brandt v. Wand Partners,* 242 F.3rd 6, 14, 17 (1st Cir. 2001). The theory of unjust enrichment is that "[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other." *Nat'l Shawmut Bank v. Fidelity Mut. Life Ins. Co.,* 318 Mass. 142, 146 (1945), quoting *American Law Institute Restatement of Restitution § 1.*  The benefit recipient is only liable to the other if under the circumstances it would be unjust for the recipient to retain the benefit without compensation therefore.  *Nat'l Shawmut Bank*, 318 Mass. at 146. A claim for unjust enrichment under Massachusetts law requires proof of "unjust enrichment of one party and unjust detriment to the other party." McCabe v. Gedco LLC, 345 BR1, 10 (D.Mass.2006).  The purpose of a cause of action for

unjust enrichment is to "provide an equitable stop gap for occasional inadequacies in contractual remedies at law." Mass. Infirmary v. QLT Incorporated, 412 F. 3d 215, 234 (1st Cir. 2005).

In this case, the Defendant wanted and got a contract that it never should have received if it had complied with its legal duties. Because of the expected rising real estate market, the Defendant wanted the subject loan of this Action and stood to benefit from the Plaintiff's default and the resulting foreclosure on the subject loan that it knew or should have known was inevitable. There are no contract damages — the Defendant made the loan.

It is for these reasons that the equitable remedy of unjust enrichment is required consisting of a refund of all paid interest because otherwise the Defendant would reap the benefit from its breach of legal duty. Otherwise, the concept of "underwriting" standards would become meaningless because there are no contract damages that would be paid for bad underwriting. There are no contract damages — the Defendant made the loan. It is for these reasons that the equitable remedy of unjust enrichment is required consisting of a refund of all paid interest and profit because otherwise the Defendant would reap the benefit from its breach of legal duty. Contract damages cannot remedy this harm.

Because there was undisputably a contract between Plaintiff and Defendant, it would carry with it an implied obligation of good faith and fair dealing because "[e]very contact implies good faith and fair dealing between the parties to it." *Anthony's Pier Four, Inc. v. HBC Assoc.*, 411 Mass. 451, 471 (1991), quoting

*Warner Ins. Co. v. Comm'r of Ins.,* 406 Mass. 354, 362 n. 9 (1990).  See also, *King v. Driscoll*, 424 Mass. 1, 7 (1996).  "The implied covenant of good faith and fair dealing provides that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract …"  *Anthony's Pier Four, Inc.,* 411 Mass. at 471-72, quoting *Druker v. Roland Women's Jutras Assoc., Inc.,* 370 Mass. 383, 385 (1976).  Breach of this covenant is a contract claim and thus also has a 6-year limitations period. Nortek, Inc. v. Liberty Mut. Ins. Co. 65 Mass.App.Ct. 764, 769-70 (2006).

Within a couple weeks of the first re-finance loan, on 17 November 2006, Mamuszka for Frappier completed another uniform residential loan application for a "conventional" second mortgage on the property at issue to use up the remainder of any equity in the property. This loan application fraudulently increased Frappier's stated income to $8,882.31. These two loans were based on fraudulent income fabricated by the Defendant's employees that is inconsistent by $3500 — a 70% income error — in Defendant's own records just two weeks apart.

The Department of the Treasury warned banks and lenders in 2006 that "[s]imultaneous second-lien loans reduce owner equity and increase credit risk. Historically, as combined loan-to-value ratios rise, so do defaults. ...  In addition, second-lien home equity lines of credit (HELOCs) typically increase borrower exposure to increasing interest rates and monthly payment burdens." Appendix at 372. Despite these known facts and its legal duties as argued *supra*, Defendant still did nothing about the 70% discrepancy in income and went ahead with further

33

burdening the Plaintiff's property and using up the remainder of his equity with a second loan.

The fact that at the time of foreclosure in 2008, Countrywide believed that the property to have a fair market value of $359,604.28, a 70% increase in market value in two years, explains why the Defendant did not really care whether or not the two loans as structured would succeed. Plaintiff respectfully submits that such facts are more than sufficient to state a claim for breach of the implied covenant of good faith and fair dealing.

## CONCLUSION

Therefore Plaintiff asks that the summary judgment dismissal of this Action be vacated and reversed and that either 1) summary judgment as to liability be entered against the Defendant and that this matter be remanded for further proceedings; or 2) that this matter be remanded for further proceedings.

Plaintiff by his attorney,

/s/ Valeriano Diviacchi
Valeriano Diviacchi
BBO# 555940
Diviacchi Law Office
111 Beach Street    #1A
Boston MA 02111-2532
Date:                                (617) 542-3175

34

## CERTIFICATE OF COMPLIANCE

1.   This brief complies with the type-volume limitation of Fed. R. App. P.
     28.1(e)(2) or 32(a)(7)(B) because:
     [ X ] this brief contains *9,859* words, excluding the parts of the brief
     exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*
     [ ] this brief uses a monospaced typeface and contains [*state the number of*]
     lines of text, excluding the parts of the brief exempted by Fed. R. App. P.
     32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App. P.
     32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6)because:
     [ X ] this brief has been prepared in a proportionally spaced typeface
     using *Microsoft Word 2000* in *14pt Times New Roman*; *or*
     [ ] this brief has been prepared in a monospaced typeface using
     [*state name and version of word processing program*] with [*state
     number of characters per inch and name of type style*].

Dated: 3 Jan 2011            /s/ Valeriano Diviacchi
                             *Counsel for Appellee*


## CERTIFICATE OF SERVICE

     I hereby certify that on 3 January 2011 I electronically filed the foregoing
document with the First Circuit Court of Appeals by using the CM/ECF system.  I
certify that counsel of record registered as ECF Filers will be served by the
following by the CM/ECF system and that paper copies will be sent to those
indicated as non-registered participants on 3 January 2011 of which there are none.

ATTORNEY BROOK L. AMES
GOODWIN PROCTOR *ET AL*
EXCHANGE PLACE
BOSTON, MA. 02109


                             /s/ Valeriano Diviacchi

**ADDENDUM**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MARK FRAPPIER,                    )
Plaintiff                        )
                                 )
                v.               ) C.A. NO. 09-cv-11006-MAP
                                 )
COUNTRYWIDE HOME LOANS,          )
INC.                             )
Defendant                        )

MEMORANDUM AND ORDER REGARDING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT,
PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT, and
DEFENDANT'S MOTION TO STRIKE PLAINTIFF'S
CROSS MOTION FOR SUMMARY JUDGMENT
(Dkt. Nos. 19, 27, & 28)

October 7, 2010

PONSOR, D.J.

## I.   INTRODUCTION

On May 11, 2009, Plaintiff Mark Frappier filed suit
against Defendant Countrywide Home Loans, Inc. in Suffolk
County Superior Court, alleging that Defendant had engaged
in prohibited predatory lending practices in relation to
Plaintiff's home mortgage loan for a property located at 26
Matthews Road, Southwick, Massachusetts 01077.
Specifically, Plaintiff alleged violations of Mass. Gen.

Laws ch. 93A ("Chapter 93A") and the implied covenant of
good faith and fair dealing, as well as negligence and
unjust enrichment.  On June 12, 2009, Defendant removed to
this court on diversity grounds.

Defendant now moves for summary judgment.  (Dkt. No.
19.)  Plaintiff cross-moves for summary judgment (Dkt. No.
27), and Defendant moves to strike Plaintiff's cross-motion
(Dkt. No. 28).  For the reasons stated below, Defendant's
Motion for Summary Judgment will be allowed.  Plaintiff's
Cross-Motion and Defendant's Motion to Strike will be
denied.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

On or about October 27, 2006, Plaintiff refinanced the
mortgage on his home at 26 Matthews Road, Southwick,
Massachusetts.  Defendant provided the financing.
Plaintiff's original mortgage dated to 1999, and Plaintiff
had refinanced the property a number of times.  This
particular refinancing had to be accomplished quickly, as
there was a deadline imposed under the terms of Plaintiff's
divorce.  Plaintiff applied and was approved for a so-called
"stated income, stated asset" loan, under which Defendant

2

did not undertake to verify Plaintiff's stated income. Defendant made this expedited procedure available to Plaintiff because of his good credit history.

   The October loan application shows Plaintiff's income as $5,563/month and his occupation as "operations manager" of a local parish church. (Dkt. No. 22, Ex. H, at 2-3.) However, Plaintiff asserts that his income during the relevant period was in fact only $3,300/month, that he accurately entered the correct information ($3,300/month) on the loan application, and that the agent for Defendant somehow subsequently altered the form.  Plaintiff signed the loan application, certifying his income information as correct under penalty of perjury, but he alleges that he lacked adequate time to review the loan documents for accuracy.[1]

   Based on the information reflected in the October loan application, Plaintiff was offered a loan of $189,500.  It

---

[1] Plaintiff also contends that certain documents were not properly served on him as required under the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 et seq., and other consumer protection statutes.  However, he has admitted to throwing away a number of documents when he moved out of the Matthew Road property, and there is no TILA claim before the court.

3

was "a seven-year fixed-rate loan with an introductory interest rate of 6.875%" and monthly payments between $1500 and $1600 per month.  (Dkt. No. 21 ¶ 18.)  The monthly payments were approximately equivalent to the payments Plaintiff had been making on his previous mortgage.

On or around December 2006, Plaintiff applied for a second mortgage on the Matthews Road property.  The second mortgage application stated Plaintiff's income as $8,882.31/month.  The second application was approved as well, and Plaintiff received an additional line of credit in the amount of $37,825.84 at an APR of 10.591%, with monthly payments of $332.86.

In February 2008, Plaintiff began to have difficulty making his mortgage payments.  He attributed that difficulty to a number of causes, including his changing jobs and the rising cost of fuel.  (See Dkt. No. 22, Ex. R, Dep. of Mark Frappier 88:5-14.)  Eventually Plaintiff defaulted, Defendant foreclosed, and Plaintiff brought this action.

### III. DISCUSSION

The gravamen of the complaint is that, by approving a loan on the basis of a facially unlikely income amount

4

and/or a fraudulently altered loan application, Defendant
engaged in predatory lending practices.  Specifically, the
complaint alleges:

- Unjust Enrichment (Count 1)

- Entitlement to Equitable Relief (Count 2)

- Violation of Implied Covenant of Good Faith and Fair
  Dealing (Count 3)

- Violation of Mass. Gen. Laws ch. 93A (Count 4)

- Negligence (Count 5)

Plaintiff also requests the removal of the loan from his
credit history.  (Dkt. No. 1, Ex. B, State Court Compl.
Count 2 ¶ 26.)

A.   Defendant's Motion for Summary Judgment.

Summary judgment is appropriate when "the pleadings,
the discovery and disclosure materials on file, and any
affidavits show that there is no genuine issue as to any
material fact and that the movant is entitled to judgment as
a matter of law." Fed. R. Civ. P. 56(c)(2).  On issues for
which the non-moving party bears the ultimate burden of
proof, the non-moving party "must present definite,
competent evidence" to avoid summary disposition.  Mesnick
v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991).

Plaintiff has the burden of persuasion at trial. Defendant is therefore entitled to summary judgment on any particular claim if Plaintiff lacks sufficiently probative evidence to support each element of that claim.

> 1. Chapter 93A (Count 4).

Mass. Gen. Laws ch. 93A, § 2 prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Plaintiff argues that the loan at issue was "unfair" within the meaning of Chapter 93A because Defendant knew that Plaintiff would be unable to repay it. (Dkt. No. 26 at 5.) Plaintiff relies primarily on Commonwealth v. Fremont, 897 N.E.2d 548, 556, 560 (Mass. 2008), which stands for the proposition that it is unfair to originate "loans with terms that in combination would lead predictably to the consequences of the borrowers' default and foreclosure," even if the loans at issue are not "high cost home mortgage loans" as defined under Mass. Gen. Laws ch. 183C, § 2.

It is true that a lender may run afoul of Chapter 93A by knowingly setting up a borrower for default. However, Plaintiff has pointed to no evidence in the record that Defendant had such knowledge or intent. The terms of the

6

refinanced mortgage were on their face favorable to
Plaintiff; at the very least they were comparable to the
terms of his previous mortgage.  Plaintiff himself
attributed the default to a number of factors, including
increased heating costs and his change in jobs, none of
which Defendant could have predicted.

At oral argument, Plaintiff suggested that the
subsequent December loan made default on the October loan
more likely and argued that, in determining whether
Defendant unfairly offered Plaintiff a loan that ensured his
default, the court should treat the loans together.
However, Plaintiff has produced no evidence that the loans
were in fact contemplated as a package.  Indeed, the
complaint itself does not refer to the December loan at all.
Moreover, even if the two loans were negotiated together, it
is still not clear how or why the terms of such a package
were rigged to ensure Plaintiff's failure.

For these reasons, the court will find that Plaintiff
has produced no evidence that Defendant's conduct was either
unfair or deceptive, and Defendant's Motion for Summary
Judgment will be allowed with respect to Count 4.

2.   <u>Negligence (Count 5)</u>.

To prevail on a negligence claim, a plaintiff must show "duty, breach of duty . . . causation . . . and damages." <u>Bennett v. Eagle Brook Country Store, Inc.</u>, 557 N.E.2d 1166, 1168 (Mass. 1990).  Defendant argues that it owed Plaintiff no duty of due care because its relationship with Plaintiff was not fiduciary in nature.

In general, the relationship between a borrower and a lender is not fiduciary.  <u>See</u> <u>Rockland-Atlas Nat'l Bank v. Barry</u>, 143 N.E.2d 534, 536 (Mass. 1955), <u>cited in</u> <u>In re Greenberg</u>, 212 B.R. 422, 428 (Bankr. D. Mass. 1997).  <u>See also</u> <u>Shanley v. Rockland Trust Co.</u>, 735 N.E.2d 1273 (table), 2000 WL 1476109 at *3 (Mass. App. Ct. 2000)(citing <u>Shawmut Bank, N.A. v. Wayman</u>, 606 N.E.2d 925, 927 (Mass. App. Ct., 1993)).  For a fiduciary relationship to exist, one party must repose trust or confidence in another, who knows of and accepts that trust.  <u>Broomfield v. Kosow</u>, 212 N.E.2d 556, 560 (Mass. 1965), cited in <u>Cahaly v. Benistar Prop. Exch. Trust Co.</u>, 864 N.E.2d 548, 560 (Mass. App. Ct. 2007).

Plaintiff has not produced evidence that his relationship with Defendant was characterized by heightened

8

loyalty, trust, or confidence so as to give rise to a duty
of care on Defendant's part.   Instead, Plaintiff argues
generally that a cause of action for "negligent
underwriting" exists because "evolving standards governing
lenders . . . can be found . . . in regulatory and statutory
provisions."   (Dkt. No. 26.)[2]   Plaintiff does not explain
how the existence of any particular statute or regulation
imposes an affirmative duty on Defendant not to offer
"stated income/stated asset" loans to consumers with good
credit histories.   And, with respect to the alleged breach
of such a duty, Plaintiff has identified no statute or
regulation that Defendant's lending practices actually
violated.

Because Plaintiff has identified no legal duty that
Defendant's conduct allegedly breached, Defendant's Motion
for Summary Judgment will be allowed with respect to Count

---

[2] During oral argument, Plaintiff cited regulations
promulgated under the Home Ownership and Equity Protection
Act ("HOEPA"), 15 U.S.C. § 1639, to suggest that Defendant's
conduct had violated a generally recognized "standard of
care" reflected in federal regulations.   (Dkt. No. 35,
Plaintiff's Sur-Reply 1.)   Since both parties have
subsequently agreed that neither HOEPA nor its implementing
regulations govern either of the two loans, the court will
consider only the general "standard of care" argument.

5.

###    3.   Unjust Enrichment (Count 1).

Defendant argues that Plaintiff cannot recover for unjust enrichment because Plaintiff has failed to produce evidence or even specifically to allege that Defendant's conduct was "unjust."  "Unjust enrichment is defined as retention of money or property of another against the fundamental principles of justice or equity and good conscience."  Santagate v. Tower, 833 N.E.2d 171, 176 (Mass. App. Ct. 2005) (internal citations omitted).  "Unjust enrichment, as a basis for restitution, requires more than benefit.  The benefit must be unjust, a quality that turns on the reasonable expectations of the parties."  Community Builders, Inc. v. Indian Motocycle Assoc., Inc., 692 N.E.2d 964, 979 (Mass. App. Ct. 1998).

Plaintiff argues that Defendant's retention of interest on the loan is unjust because Defendant "wanted the subject loan . . . and stood to benefit from plaintiff's default," which default it "knew or should have known was inevitable." (Dkt. No. 26, Pl.'s Mem. in Opp. 7.)  However, as noted above, there is no evidence in this record from which a jury

could conclude that Defendant believed or had any reason to believe that Plaintiff was at a heightened risk of default, much less that such default was "inevitable."

Because there is no evidence that Plaintiff's payment of interest to Defendant was unjust, Plaintiff cannot recover on a theory of unjust enrichment, and Defendant's Motion for Summary Judgment will be allowed with respect to Count 1.

### 4. Implied Covenant of Good Faith and Fair Dealing (Count 3).

The implied covenant of good faith and fair dealing provides "that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Druker v. Roland Wm. Jutras Assocs., 348 N.E.2d 763, 765 (1976), cited in Anthony's Pier Four, Inc. v. HBC Assoc., 583 N.E.2d 806, 820 (Mass. 1991). The covenant concerns the manner of a contract's performance, not the contract's formation. Renovator's Supply, Inc. v. Sovereign Bank, 892 N.E.2d 777, 789 (Mass. App. Ct. 2008), rev. denied, 896 N.E.2d 632 (2008).

Plaintiff alleges that Defendant was indifferent to the

11

success of the combined loans and argues that, by granting
the December loan, Defendant increased Plaintiff's risk of
default on the October loan, thereby interfering with
Plaintiff's ability to enjoy the benefits of that loan.
However, as noted above, there is no evidence that Defendant
believed that either loan, by itself or as a package, was
particularly likely to fail.  Without such evidence, the
court cannot find that Defendant's purported indifference to
Plaintiff's successful repayment is actionable.

Plaintiff has produced no evidence that Defendant
sought, precipitated, or should have anticipated the failure
of the October mortgage.  Accordingly, Defendant's Motion
for Summary Judgment will be allowed with respect to Count
3.

        5.    <u>Removal of Loan from Credit History (Count 2)</u>.

In Count 2 of the complaint, Plaintiff does not
identify a specific cause of action but requests an
injunction ordering the removal of the loan from his credit
history.  Because Count 2 does not articulate a cause of
action and because there are no facts in this case that
would justify the requested injunctive relief, Defendant's

12

Motion for Summary Judgment will be allowed with respect to
Count 2.

**B.    Plaintiff's Cross Motion for Summary Judgment and
      Defendant's Motion to Strike.**

     Plaintiff cross moves for summary judgment, and
Defendant moves to strike the motion.  For the reasons
stated above, Plaintiff's motion will be denied.
Defendant's motion to strike will therefore be denied as
moot.

**IV.    CONCLUSION**

     For the foregoing reasons, Defendant's Motion for
Summary Judgment (Dkt. No. 19) is hereby ALLOWED,
Plaintiff's Cross Motion for Summary Judgment (Dkt. No. 27)
is hereby DENIED, and Defendant's Motion to Strike
Plaintiff's Cross Motion for Summary Judgment (Dkt. No. 28)
is hereby DENIED as moot.  The clerk is ordered to enter
judgment for Defendant.  This case may now be closed.

     It is So Ordered.


                              **/s/ Michael A. Ponsor**
                              **MICHAEL A. PONSOR**
                              **U.S. District Judge**


13